UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

DEBORA M. PRECHT, ET AL          CIVIL ACTION NO. 14-CV-0743

VERSUS                                JUDGE: MINALDI

AMERICAN TOWER
CORPORATION, ET AL             MAGISTRATE JUDGE: KAY

---

## MEMORANDUM IN OPPOSITION TO GTP'S
## MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs, Debora M. Precht, William Precht, III, and Lauren Precht Thompson (collectively, "Plaintiffs") respectfully submit this memorandum in opposition to the motion for summary judgment filed by defendants, Defendants, Global Tower, LLC, Global Tower Partners, GTP Infrastructure I, LLC, and GTP Investments, LLC (collectively, "GTP"). GTP has not and cannot carry its burden of proving that no genuine issue of material fact exists, and its motion for summary judgment must be denied accordingly.

## INTRODUCTION

I.    **Disputed Issues of Material Facts**

As an initial matter, many facts are disputed.  In accordance with FED. R. CIV. P. 10(c), Plaintiffs submit and incorporate by reference the attached Statement of Disputed Facts.

II.    **General Background**

As the Court is likely aware, this suit was brought as a result of the untimely death of William "Billy" Precht, Jr. who died in a plane crash, on February 15, 2013, after his crop duster struck an unmarked guywire of a communication tower ("the tower") owned and operated by one or more of the defendants.  The tower is situated on a tower site ("the site") consisting of two

acres of raw land adjacent to a crop field. The site is leased, subject to a recorded ground lease, by Global Tower, LLC.  However, the tower is owned by GTP Infrastructure I, LLC.  The lease gives GTP full custody and control of the leased premises.  [Document 15-3 & 17-1, p.12].

Contrary to Jefferson Davis Parish Ordinance 5.5-107 (hereinafter, "Ordinance 5.5-107"), which requires all guy wires supporting a tower be marked with tana wire marker balls, the tower was guyed by unmarked guy wires extending from the tower approximately three hundred feet (300') into the adjacent crop field.  Likewise, none of the six anchors securing the tower's guy wires were marked.  As a result of the Defendants' failure to prudently operate, maintain, and use the tower and the leased premises on which the tower sits, the inconspicuous guy wires remained obscured and unmarked, which caused Mr. Precht accident and untimely death.

Plaintiffs made a wrongful death claim for GTP's fault in failing to mark the guy wires. Plaintiffs' allege GTP is at fault under the strict liability theory of La. Civ. Code art. 2317 and the general negligence theory of La. Civ. Code art. 2315.  Although discovery is ongoing, ample evidence exists to support each element of the Plaintiffs' claims. Thus, GTP cannot carry its burden of proving no genuine issue of material fact exits, and its motion for summary judgment must be denied accordingly.

## STANDARD OF REVIEW

This Court is of course highly familiar with the standard for granting summary judgments.  Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  See *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*.  In effect, GTP is requesting this Court subrogate the role of the jury by making a pre-trial adjudication of these factual issues.  As the moving party, GTP bears the burden of

establishing that there are no genuine issues of material fact.  *Id.*  However, GTP's arguments are conclusory and unsubstantiated by evidence.  Moreover, discovery is ongoing, and not all facts have been developed.  Accordingly, summary judgment is inappropriate and premature.

Since GTP, the movant, will not bear the burden of persuasion at trial, it must prove there is no genuine issue of material fact related to an essential element of the Plaintiffs' claim.  *See Celotex, 477 U.S. at 325*; *see also Lavespere, 910 F.2d at 178*.  This has been interpreted to mean that no reasonable trier of fact could find for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In order to determine whether to grant the motion, the Court must "view facts and inferences in the light most favorable tot eh non-moving party." *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 740 (5th Cir. 2008).  If, and only if, GTP is able to carry its burden (which it has not and cannot), Plaintiffs must present evidence to the contrary.  *See Celotex, 477 U.S. at 324*.   Unfortunately for GTP, this case contains a significant number of disputed material facts, which precludes summary judgment.

## LAW AND ARGUMENT

Since this is a diversity case, Louisiana substantive law applies.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Plaintiffs have made state law negligence claims against the defendants for their failure to properly design and construct the tower guy wires, failure to provide proper maintenance of the tower guy wires, failure to provide adequate signage and marking of the tower guy wires and guy wire anchors, and failure to meet the requisite standard of care in this situation.  Plaintiffs also allege the defendants are negligent *per se* for their failure to comply with Ordinance 5.5-107, which requires tana wire markers, or spherical balls, be used to mark guy wires used to support any tower located in in Jefferson Davis Parish, such as this tower, to "enable aircraft pilots to identify the location of such guy wires."  Thus, Plaintiffs claim GTP is

at fault under general negligence/imprudence premise liability and strict liability theories pursuant to *Louisiana Civil Code Arts. 2315, 2316*, *2317, and 2317.1*.

GTP misrepresents the Plaintiffs' claims to this Court by characterizing and analyzing the claims as an injury from a defective **building** pursuant to La. Civ. Code art. 2322 when the claims truly lie within the purview of La. Civ. Code art. 2317.1. As GTP notes, La. Civ. Code art. 2322 is Louisiana's version of strict liability for injury caused by a defective **building**. *Trautmann v. Fitzgerald*, 2012-1270 (La.App. 3 Cir. 4/3/13, 18), 113 So.3d 429, 441, *writ denied*, 2013-1003 (La. 6/14/13), 118 So.3d 1089.  In contrast, La. Civ. Code art. 2317.1 is Louisiana's version of strict liability for injury caused by a **defective thing in one's custody or garde**.  *Davis v. Riverside Court Condo. Ass'n Phase II, Inc*., 2014-0023 (La.App. 4 Cir. 11/12/14, 6), 154 So.3d 643, 648.  In the classification of property, Louisiana law draws a distinction between "buildings" and "other constructions," such as the tower and its guy wires. *See* La. Civ. Code art 463; *see also Olsen v. Shell Oil Co*., 365 So.2d 1285, 1290 (La. 1978) (discussing the definition of "building" as defined by La. Civ. Code art. 463). While a "building" need not be intended for human habitation, the definition contemplates some ability to be occupied.[1] For instance, a dock built over "raw land" was not a "building" under La. Civ. Code art. 2322. *Dupre v. ABC Ins. Co*., 2004-0144 (La.App. 4 Cir. 11/15/00, 5) 776 So.2d 25, 2, *writ denied sub nom. Dupre, V. ABC Ins. Co*., 2001-0547 (La. 4/20/01), 790 So.2d 641.

Here, just as the dock in *Dupre*, GTP's tower is erected over raw, vacant, undeveloped land.  The tower is a guyed skeletal structure designed to be unoccupied.  Unlike an oil derrick, the tower is not, nor was it designed or constructed to be, a platform from which people can

---

[1] An oil drilling platform with living quarters permanently attached to the ground is a "building." *Olsen, supra*.  In contrast, a dock built over raw land in Gretna, Louisiana was not a "building." *Dupre v. ABC Ins. Co*., 2004-0144 (La.App. 4 Cir. 11/15/00, 5) 776 So.2d 25, 2, *writ denied sub nom. Dupre, V. ABC Ins. Co*., 2001-0547 (La. 4/20/01), 790 So.2d 641.

4

work.  Simply stated, the Louisiana Civil Code considers the unoccupied skeletal structure of the tower and its guy wires to be an "other construction," or "thing," not a "building."  Accordingly, La. Civil Code art. 2317.1, the authority on claims for injury caused by a defective "thing" in another's custody or *garde*, is the applicable law.

Plaintiffs have alleged GTP is at fault, as the owner and custodian of the tower, in maintaining the tower (i.e. a thing) in a defective condition (i.e. without guy wire markers) pursuant to La. Civ. Code art. 2317.1.  To make the *prima facie* case for custody, or *garde*, liability, evidence must exist to support 1) GTP either owned or had care, custody, or control of the tower and its guy wires, 2) the tower guy wires were the cause in fact of Mr. Precht's death, 3) the tower guy wires presented an unreasonable risk of harm, and 4) GTP knew or should have known of the defective condition.  *Conner v. Kraemer-Shows Oilfield Servs., LLC*, 33 F.Supp.3d 725, 727-28 (W.D.L.A. 2014).

Plaintiffs have also alleged GTP's fault for failing to mark the guy wires under a general negligence theory pursuant to La. Civ. Code art. 2315 *et seq*. To make the *prima facie* case for fault under La. Civ. Code art. 2315, Plaintiffs will show evidence of fault, causation, and damage. *Able Sec. & Patrol, LLC. v. Louisiana*, 569 F.Supp.2d 617, 635 (E.D. La.2008).  "Fault is a broad concept and, of course, includes negligence." *Id.* (citing La. Civ. Code art. 2316). Accordingly, La. Civ. Code art. 2316 must be read in conjunction with La. Civ. Code art. 2315. *Maher v. Schlosser*, 144 So.2d 706, 708 (La. Ct. App. 1962). The analysis for negligence is divided into duty and breach of duty. *Able Sec. & Patrol, LLC*, 569 F.Supp.2d at 635.

Thus, in Louisiana where the duty/risk analysis is used, summary judgment is inappropriate when evidence supports the existence of:

1) Defendant's duty to conform its conduct to a particular standard of care,
2) Defendant's breach of that duty,

3)  Defendant's substandard conduct in fact caused the plaintiffs' injuries,
4)  Defendant's substandard conduct was a legal cause of the plaintiff's injuries,
5)  Plaintiff's actual damages.

*Lawrence v. Sanders*, 49,966 (La. App. 2 Cir. 6/14/15, 6), 169 So.3d 790, 795, *writ denied* 2015-

1450 (La. 10/23/15), 179 So.3d 601.

In sum, GTP's motion for summary judgment presents two issues to this Court: 1) whether sufficient evidence so as to create a genuine issue of material fact related to each essential element of the Plaintiffs claims, and 2) whether Ordinance 5.5-107, which requires the marking of guy wires supporting towers located in Jefferson Davis Parish, is preempted by federal regulation.  However, GTP's motion for summary judgment is due to be denied.

First, GTP failed to carry its burden of establishing the absence of any genuine issue of material fact related to any particular element of the Plaintiffs claims.  Stated another way, competent evidence related to each element of the Plaintiffs exits, which creates genuine issues of fact thereby precluding summary judgment.  Second, GTP's argument that Ordinance 5.5-107 is preempted and thus creates no duty for GTP is fatally flawed.  Ordinance 5.5-107 imposes a statutory duty on GTP to mark the guy wires, but even if it was preempted, which it is not, GTP's duty to warn of the guy wires' location is also created by other rules of law.

**A.  <u>GTP is strictly liable for the damage caused by the tower in its custody.</u>**

GTP failed to carry its burden of proving there is no genuine issue of material fact related to Plaintiffs' claim for custody/garde liability.  On the contrary, there is ample evidence support each of the essential elements of the Plaintiffs' La. Civ. Code art. 2317.1 *garde*, liability claim, that is: 1) GTP owned, had care, custody, and/or control of the tower and its guy wires, 2) the tower guy wires were the cause in fact of Mr. Precht's death, 3) the tower guy wires presented an unreasonable risk of harm to all aircraft pilots and particularly to agriculture aircraft pilots, such

as Mr. Precht, and 4) that GTP knew or should have known of the defect, that its unmarked guy wires extended into the adjacent crop field.  *Conner*, 33 F.Supp.3d at 727-28.

### 1.   GTP owned, had custody, control, and garde of the tower and its guy wires.

"Garde is the obligation imposed by law on the proprietor of a thing, or on one who avails himself of it . . . ." *Leaman v. Cont'l Cas. Co.*, 00–0292, p. 4 (La.App. 4 Cir. 9/26/01), 798 So.2d 285, 289.  The owner of a thing is presumed to have *garde* of it. *Id*. "[T]he person who has the garde of a thing shall be <u>strictly liable</u> for damage caused another by the vice or defect of the thing, his legal responsibility being based on the breach of his legal obligation to keep his thing in such condition that it does no damage to others." *King v. Louviere*, 543 So.2d 1327, 1328 (La.1989) (emphasis added). *Garde* is a factual question determined by considering one's relationship to the thing so as to have the "right of direction and control over the thing" and what type of benefit one derives from the thing. *Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00, 8), 765 So.2d 1002, 1009 (citing *King*, 543 So.2d at 1329). "The fault of the custodian is based upon his failure to prevent the thing under his garde from causing an unreasonable risk of injury to others." *Dupree*, 765 So.2d at 1009.

Here, GTP's own evidence submitted in connection with this motion establishes the tower and guy wires were owned and was "in the care, custody, and control (garde)" of GTP. *See Id*.  GTP has submitted numerous documents to this Court, and most recently submitted in support of this motion an excerpt of Michael McCormack's deposition in which he testifies the tower was owned and in the control of GTP Infrastructure I, LLC.  Thus, not only is GTP presumed to be the owner of the tower, GTP admits to being the owner and custodian of the tower and its guy wires on the date of Mr. Precht's death.  Additionally, this Court previously found a valid transfer the tower and tower site lease from Telcom Rentals, the previous owner, to

GTP. [Document 24].  Likewise, the tower site lease with Krielow Farms, Inc. establishes GTP is custody of the premises identified in that lease, which is essentially the footprint of the tower. [Document 15-3 & 17-1, p.12] Thus, sufficient evidence exists to establish the tower and guy wires as well as the premises on which the tower is situated were in the *garde* of GTP on February 15, 2013, the date of the wire strike.

   2.   *The tower's unmarked guy wires caused Mr. Precht's death.*

   Causation is obvious, and cause-in-fact of an injury is a factual question for the jury to decide. *Faye v. State, Dep't of Transp. & Dev*., 97-512 (La.App. 3 Cir. 10/29/97, 4), 702 So.2d 1036, 1040, *writ denied*, 97-2974 (La. 2/6/98), 709 So.2d 741.  Cause-in-fact is established if either 1) if GTP's failure to mark the guy wires "was a substantial factor in bringing about" the wire strike that killed Mr. Precht **or** 2) if the wire strike would not have happened "but for" the guy wires being unmarked.  *Id*. "In short, if the tortfeasor's actions had something to do with the injuries sustained, then a causal relationship exists." *Id*. (citing *Ayres v. Beauregard Electric Cooperative, Inc*., 94-811 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, *writ denied*, 95-2432 (La.12/15/95), 664 So.2d 455.

   Here, although discovery is ongoing and facts are presently being developed, the evidence establishes the unmarked guy wires caused the wire strike that killed Mr. Precht.  As Lemuel Shattuck, a professional agriculture pilot, testifies in his affidavit attached hereto as Exhibit A, guy wires such as those on GTP's tower are difficult to visually perceive when piloting an aircraft in the vicinity of the tower.  Mr. Shattuck explains that had the tower been properly marked with conspicuity enhancing devices as required by Ordinance 5.5-107 and as required by any prudent tower owner whose guy wires extend 300 feet in to an adjacent agriculture field, Mr. Precht "more likely than not could have avoided the wire strike." [Exhibit

A].  Mr. Shattuck goes on to express his professional opinion that GTP's failure to mark the ugy guy wires was the cause in fact of the wire strike that killed Mr. Precht. [Exhibit A].

Undoubtedly, had Mr. Precht been able to visually perceive the location of the guy wires, he would have been able to avoid the wire strike.  Plainly put, increased conspicuity provides an increased distance from which the guy wire location can be visually perceived, which gives the pilot an increased time to react and avoid a wire strike.  Not only is GTP's failure to adequately mark the guy wires to warn of their location a "substantial factor in bringing about" the wires strike, but also "but for" the inconspicuous guy wires being unmarked, the wire strike more likely than not would have been avoided.  Accordingly, sufficient evidence exits to establish cause-in-fact.  At a minimum, the evidence creates a genuine issue of material fact to be decided by the jury, which renders summary judgment inappropriate.

### 3.   *The tower's unmarked guy wires presented an unreasonable risk to pilots.*

Whether a defect is an "unreasonable risk of harm" is an "unscientific, factual determination" for the jury to decide "in light of the facts and circumstances of each particular case." *Broussard v. State ex rel. Office of State Bldgs.*, 2012-1238 (La. 4/5/13, 9), 113 So.3d 175, 183-84. The Louisiana Supreme Court has explained:

> The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically . . . . The concept, which requires a balancing of the risk and utility of the condition, is not a simple rule of law which can be applied mechanically to the facts of the case . . . . Because of the plethora of factual questions and other considerations involved, the issue necessarily must be resolved on a case-by-case basis.

> There is no fixed rule for determining whether the thing at issue presents an unreasonable risk of harm. In determining whether a defect creates an unreasonable risk of harm, the courts use a risk-utility balancing test in which the gravity and risk of harm is balanced against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. In other words, the trier of fact must decide whether the social value and utility of the hazard outweigh its potential harm to others. [Citations omitted.]

*Reed v. Wal–Mart Stores, Inc.*, 97–1174, p.4-5 (La.3/4/98), 708 So.2d 362, 364-65. Accordingly, Louisiana jurisprudence has developed the risk-utility balancing test to consider four factors:

1. The utility of the complained-of condition (i.e. inconspicuous/unmarked guy wires);
2. Likelihood and magnitude of harm, including the apparentness of the condition to all persons;
3. Cost of preventing the harm;
4. Nature of the plaintiff's activities in terms of social utility or dangerous nature.

*Broussard*, 113 So.3d at 184. Here, the risk of harm created by GTP's failure to adequately mark the inconspicuous guy wires and secure the premises of the tower site is great when weighed against the guy wires' social utility and the cost of preventing harm, Mr. Precht's death.

### a. *Utility of the Unmarked Guy Wires.*

The unmarked guy wires do not provide any necessary societal function.  This analysis focuses on the particular thing alleged to be defective. For instance, in *Broussard*, where the Plaintiff, Broussard (a United Parcel Service deliveryman) delivered packages to a state building for the seven years before being injured when he slipped on a misaligned elevator, the Court analyzed the utility of the elevator, not the State's building.  *Id*.

Likewise, here, the utility of the inconspicuous unmarked guy wires, not the tower, must be examined.  The guy wires are used to support a tower that provides radio services to communication providers, namely cellular providers.  While society has certainly grown fond of cellular communications, it is modern luxury, not a societal necessity.  Since the tower does not provide a necessary function to society, neither do the guy wires supporting it.  More to the point, while some social gratification may be derived from the tower, it is undisputed that absolutely no social utility derived from the unmarked condition of the guy wires.  Therefore, this factor weighs in favor of finding the unmarked guy wires are unreasonably dangerous.

### b. *Likelihood and Magnitude of Harm*

The likelihood of an aircraft striking an unmarked guy wire that extends the length of a football field into the adjacent crop field is extremely high.  Moreover, the likelihood of a wire strike by a general aviation aircraft is significant because the tower is located 3.9 nautical miles from the Jennings airport off the approach end of Runway 31. [Exhibit A].  The magnitude of guy wire and/or tower strikes by aircraft is invariably fatal, and thus, of great magnitude.

Here, it is well-known that Jefferson Davis Parish is a rural community and that agriculture is one of its, if not the, primary industries.  The most recent USDA Census found that Jefferson Davis Parish alone has over a quarter of million acres of cropland, which yielded more than $74,000,000 of revenue in crop sales. [Exhibit B]. Likewise, it is well-known that agriculture support services, such as aerial application for crops, is also sizable in Jefferson Davis Parish.  Since agriculture air traffic is extremely common in the parish, just as it is in all of South Louisiana, the likelihood of an aircraft striking an unmarked guy wire is significant.

As, Mr. Shattuck testifies, agriculture pilots are routinely required to applicate near guyed towers. [Exhibit A].  Moreover, the very essence of the guy wire marking requirement of Ordinance 5.5-107, is Jefferson Davis Parish citizens and officials' recognition of the great magnitude of danger posed to pilots, and particularly to agriculture pilots, and the substantially increased likelihood of guy wire strikes. The magnitude of harm of guy wire strikes by aircraft is almost always catastrophic.  Aircraft are expensive and human life is invaluable.  Usually, wire strikes result in a total loss of the aircraft and often a loss of life.  Accordingly, the significant likelihood and insurmountable magnitude of an aircraft striking an inconspicuous, unmarked guy wire that extends 300 feet into a crop field in Jefferson Davis Parish weigh in favor of finding the condition to present an unreasonable risk of harm.

GTP attempts to argue the risk of harm presented by the unmarked guy wires was not unreasonable because it was open and obvious.  However, "in order to be open and obvious, the risk of harm should be apparent to ***all*** who encounter the dangerous condition." *Broussard*, 113 So.3d at 188.  "The open and obvious inquiry thus focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge." *Id*. (emphasis added).  Thus, the victim's knowledge of the defective condition is irrelevant to the question of whether the defect created an unreasonable risk of harm, but rather, knowledge goes to the principles of comparative fault decided by the jury.  *Id*.

For instance, in *Broussard*, the Mr. Broussard delivered packages to and used its elevator in a State building on a daily basis for seven years before being injured by the misaligned elevator.  *Id*. at 180.  The Court found although the defective elevator was apparent to Broussard, it was not "open and obvious to all" despite testimony from other workers in the building about their knowledge the elevator defect.  *Id*.  Thus, contrary to GTP's wishful assertions, even though Mr. Precht's was not as familiar with the tower as GTP contends, his knowledge is irrelevant to determining whether the unmarked guy wires posed an unreasonable risk of harm.

Here, the unmarked condition was not open and obvious to all.  Like *Broussard*, it is irrelevant how often Mr. Precht flew around the tower, just as it was irrelevant how often Broussard used the defective elevator, which is far more often than Mr. Precht flew around the tower.  Likewise, it is irrelevant whether others knew the tower had guy wires or whether those wires were unmarked.  The relevant question is whether the unmarked guy wires are open, obvious, and apparent to all pilots, including those who is unfamiliar with the tower.  The simple answer is the inconspicuous wires are not open and obvious to all who encounter the tower.

Mr. Shattuck's affidavit testimony establishes pilots' difficulty in visually perceiving guy wires, such as those on GTP's tower.  [Exhibit A]. Regardless of whether the guy wires can be seen while standing still near the tower, the relevant inquiry is whether a pilot flying in the vicinity of the tower can see them.  The evidence indicates the guy wires simply hard to see when piloting an aircraft, whether it be a general aviation aircraft approaching or departing the Jennings airport or an agriculture aircraft working in the crop field adjacent to the tower. [Exhibit A].  Accordingly, the evidence supporting the clandestine nature of the unmarked guy wires as well as the likelihood magnitude of an aircraft striking guy wires anchored in the adjacent crop field must be weighed by the jury.  Thus, summary judgment is inappropriate.

### c. *Cost of Preventing Harm*

The jury "must balance the risk of harm against the cost and feasibility of repair." *Broussard*, 113 So.3d at 192.  In *Broussard*, the Court held the cost to repair the elevator was not "inordinate or cost-prohibitive" when weighed against the gravity of harm posed by the defect. *Id*. Like Broussard, the cost of marking the guy wires with conspicuity enhancing devices such as high visibility sleeves and tana wire marker balls is not cost prohibitive when weighed against risk of harm.  The risk of harm is undeniably substantial.  This wire strike resulted in the total loss of the aircraft and the loss of Mr. Precht's life.  The cost to repair the tower after the wire strike was in excess of $125,000.  [Exhibit A's exhibit b.vii].

The cost to add conspicuity enhancing markers is disturbingly low. Mr. Shattuck's affidavit testimony establishes the tower guy wires could be marked similar to guy wire marking on Meteorological Evaluation Towers (MET). [Exhibit A]. Ordinance 5.5-107 requires markers and the FAA recommends high visibility sleeves and tana spherical marker balls be installed on guy wires. [Exhibit A].  High visibility sleeves are **$1.50 each** and tana wire marker balls are

**$324.95 each**.  [Exhibit A].  Marking the tower's guy wires as recommended by the FAA would require 30 high visibility sleeves and six (6) marker balls, for a **total material cost of $1,994.70**. [Exhibit A].

Plainly put, for a cost of $1,994.70, a repair cost in excess of $125,000 could have been avoided, the total loss of an aircraft could have been averted, and a life would have been saved. The cost of remedying the defective condition by properly marking the guy wires pales in comparison to the risk of harm.  The evidence weighs in favor of finding the risk of harm posed by the unmarked guy wires is unreasonable, although that is a question to be answered by the jury.  Summary judgment is therefore inappropriate.

### d.   *Nature of the Plaintiffs Activities.*

Aerial application of crop inputs carries great social utility.  In effect, agriculture pilots are instrumental in growing food for society by assisting farmers produce crops.  Mr. Precht was no different.   While aerial application carries certain risks, risks can be mitigated.   It is incumbent upon society, including GTP as the custodian of the tower, to help those who help society by acting prudently to mitigate risks.

Here, the risk of a wire strike could have been mitigated by the installation of conspicuity enhancing devices on the unmarked guy wires.  Agriculture pilots are taught procedures to avoid wire strikes, but one cannot avoid what one cannot see.  Although Mr. Precht applied chemical in the field adjacent to the tower as any prudent aerial applicator would, he could not avoid what he could not see, the unmarked guy wires. [Exhibit A].  In other words, as Mr. Shattuck testifies, Mr. Precht was using a text book maneuver to apply chemical in order to mitigate his risks. [Exhibit A].

Thus, the social utility of assisting in providing food to society far outweighs the risk involved with agriculture aviation, particularly because the risks can be and should be mitigated. The evidence supports finding the risk of harm presented by the unmarked guy wires is unreasonable.  At any rate, "the fact-finder, employing a risk-utility balancing test, determines which risks are unreasonable and whether those risks pose an open and obvious hazard." *Broussard*, 113 So.3d at 185.  Accordingly, GTP's summary judgment should be denied.

### 4.  GTP knew or should have known the guy wires were unmarked.

The entire premise of GTP's defense is its allegation that the tower was in compliance with FAA minimum standards.  In its argument, GTP admits it regularly monitored the tower. GTP also did a "Due Diligence Site Audit" dated April 30, 2010 [Document 94-2 p. 9-14].  GTP representatives obviously visited the tower site during the site audit because in the section of the report titled "Site Defect Comments" noted defects are "Site Has No Fence. The boundary [sic] of the site is the grass and bushes of field the site is located. (38)" and "Guy Anchor are in accessible [sic]." [Document 94-2, p.12].  Although, no mention of guy wire markers is made, it would have been readily apparent to any prudent person inspecting the tower site for defects during GTP's due diligence period prior to purchase in 2010. Moreover, additional facts of GTP's knowledge of the tower will be developed in the depositions of GTP officials, one of which is scheduled for February 3, 2017.

It would be disingenuous for GTP to argue it had know knowledge of that the guy wires were unmarked, nor has it attempted to do so. In addition to inspecting the tower and tower site when it purchased the tower, GTP regularly "monitors" the tower.  Accordingly, the evidence presently available indicates GTP knew the guy wires were unmarked.

**B.  Evidence supports Plaintiffs' general negligence claims.**

Plaintiffs' claims of damage from GTP's fault for its failure to mark the guy wires are general negligence claims pursuant to La. Civ. Code art. 2315 and 2316.  The elements of a negligence claim are 1) defendant's duty, 2) defendant's breach of that duty, 3) breach was cause-in-fact of harm, 4) breach was legal cause of harm, and 5) Plaintiff's actual damages. *Lawrence v. Sanders*, 49,966 (La. App. 2 Cir. 6/14/15, 6), 169 So.3d 790, 795, *writ denied* 2015-1450 (La. 10/23/15), 179 So.3d 601.  The first element, whether a duty exists is a question of law to be decided "from the facts surrounding the occurrence in question." *Harrison v. Shipp*, 98-0021 (La.App. 1 Cir. 12/28/98), 724 So.2d 864, 867.  In contrast, the other four elements (breach, cause-in-fact, legal cause, and damages) are factual questions to be decided by a jury. *White v. City of Baker Through Baker City Police Dep't*, 95-2009 (La.App 1 Cir. 5/17/96, 7), 676 So.2d 121, 125, *writ denied*, 96-1547 (La. 9/27/96), 679 So.2d 1351.

### 1.  Duty.

"A duty may be imposed by legislation or by rule of law. The inquiry is whether the plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault-to support her claim." *Harrison*, 724 So.2d at 867.  GTP's duty has been imposed not only by legislation, namely the marking requirement of Ordinance 5.5-107, but also by rule of law.  *Id*. GTP erroneously argues Ordinance 5.5-107 is preempted by federal regulation, and thus, creates no statutory duty.  While Ordinance 5.5-107 is not preempted, a duty is imposed on the tower owner, GTP, from other rules of law, including general principles of fault.

"Absence of statutory duty is not tantamount to no duty, as parameters of what constitutes fault under Civil Code reach far and wide in order to hold people accountable for their harmful actions, regardless of whether or not their actions are covered by statutory

provision." *Bethea v. Modern Biomedical Servs, Inc.*, 97-332 (La.App. 3 Cir. 11/19/97, 11), 704 So.2d 1227, 1233, *writ denied* 97-3169 (La. 2/13/98), 709 So.2d 760, and *writ denied* 97-3170 (La. 2/13/98), 709 So.2d 761 (emphasis added). Here, GTP's duty to mark the inconspicuous guy wires is 1) statutorily imposed by Ordinance 5.5-107 and 2) created by principles of law requiring the custodian of the leased premises and owner of the tower to maintain the tower and tower premises in reasonably safe condition. *Bernard v. Great Atl. & Pac. Tea Co.*, 93-1711 (La.App. 1 Cir. 8/25/94), 645 So.2d 1157, 1158. GTP as the owner of the tower and the custodian of the tower site premises, must remedy or warn of any unreasonably dangerous condition of the tower, guy wires, and/or premises of the tower site. *Id.*

### a. *Ordinance 5.5-107 imposes statutory duty on GTP to mark the guy wires.*

Ordinance 5.5-107(e) provides, "any guy wires used for support of any tower shall include tana wire markers that enable aircraft pilots to identify the location of such guy wires." Plainly put, the ordinance imposes a statutory duty on GTP to mark the guy wires. *See Harrison*, 724 So.2d at 867. Stripped to its essence, GTP's sole defense is that only the federal government can regulate tower guy wire marking requirements and that no federal regulation requires it to mark the guy wires.  In other words, the thrust of GTP's argument is the Federal Aviation Act ("FAA") preempts any other requirement that the guy wires be marked. GTP's assertions are misplaced.

"There are three types of preemption: 1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of

federal objectives." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir.2010).

Here, GTP admits the FAA contains no explicit language of express preemption, and thus, the FAA does not expressly preempt Ordinance 5.5-107.  Likewise, the guy wire marking requirement of Ordinance 5.5-107 does not conflict with any federal regulation, including the FAA, because there is no federal regulation precluding the installation of tana wire markers on guy wires.  In other words, conflict preemption is unavailable because compliance with Ordinance 5.5-107 does not conflict, whatsoever, with the federal law such that it is impossible for GTP to comply with both local and federal law.  Accordingly, GTP primarily argues, albeit erroneously, that field preemption precludes the marking requirement of Ordinance 5.5-107.

A proper preemption analysis begins with a presumption against preemption, which finds its roots in the "historic police powers of the States were not to be superseded by the Federal Act unless that was a clear and manifest purpose of Congress." *Ulysse v. AAR Aircraft Component Servs.*, 841 F.Supp. 2d 659, 667 (E.D.N.Y 2012) (citing *Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 1194–95 (2009).  Here, GTP has failed to identify any "clear and manifest purpose of Congress" to preempt the field of marking the guy wires that support radio towers, frankly, because there is none.  Rather, GTP attempts to mislead this Court by arguing the scope of preemption is broad enough to encompass the marking of guy wires, which is simply inaccurate.

Field preemption is only found where federal regulation is so encompassing that there remains no room for state or local legislation, which is another way of saying congress implicitly intended to occupy the field to the exclusion of state law supplementation.  *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999) (citing *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300 (1988).  Field preemption is present where state regulation in the field would

"interfere with Congressional objectives." *Id*. (emphasis added). Field preemption, because of its nomenclature suggests a broad scope, but "the scope of a field deemed preempted by federal law may be narrowly defined." *Abdullah*, 181 F.3d at 367 (emphasis added).

Here, GTP attempts to define the scope as "aviation safety," and in support of overly broad description, GTP cites multiple inapposite cases.[2]  While field preemption is considered on a case by case basis, the present case involves requirement to mark guy wires supporting towers located on private property in Jefferson Davis Parish.  It is simply outside the purview of federal regulated aviation safety.  Consequently, GTP makes a last-ditch effort to argue the FAA has an interest in uniform standard for marking tower guy wires.  However, Congress has no express objective in unified guy wire marking requirements.  Otherwise, there would be a unified guy wire marking requirement from the federal government.

Advisory Circular 70/7460-1L ("AC") promulgates standards for marking and lighting obstructions "that have been deemed to be a hazard to navigable airspace."  Although GTP relies entirely on this document and its predecessor, Advisory Circular 70/7460-1K, to argue AC serves as the exclusive standard to which all towers must be marked, GTP failed to establish the tower at issue is a "hazard to navigable airspace."  Moreover, "standards" set forth in the AC are qualified in Paragraph 8 of page iii, which expressly explains the application of the document is:

> **Application**.
> The FAA recommends the guidelines and standards in this AC for determining the proper way to light and mark obstructions affecting navigable airspace.  This AC does not constitute a regulation and, in general, **is not mandatory**."

---

[2] In *Big Stone Broadcasting v. Lindbloom*, a state agency attempted to usurp the regulatory authority by making a determination as to whether a tower was a hazard to air navigation, a function expressly given to the federal government.  161 F.Supp.2d 1009 (D.S.D. 2001). In *Abdullah, supra*, also cited by GTP, the Third Circuit discusses preemption within the scope of "safety standards for interstate and international air transportation." *Abdullah*, 181 F.3d at 365.  In *McMahon Helicopter Servs., Inc. v. U.S.*, the claim was a negligence claim for the placement of light pole on the airport grounds, not on private property as is the case here. 2006 WL 2130625 (E.D. Mich. 2006). The court in *U.S. Airways v. O'Donnell*, decided a preemption issue related to airline safety within the scope of training requirements for flight attendants serving alcoholic beverages on commercial flights. 627 F.3d 1318, 1328 (10th Cir. 2010).

Further, GTP's regulatory expert, Mr. Doyle, admits in his affidavit testimony at Paragraph 7 that the FAA Advisory Circulars are recommendations.  [Document 94-2, p.2].  In fact, all of the lighting and marking regulations promulgated in the AC are voluntary.  The purpose is to set the minimum standard, not the exclusive standard. In other words, the AC specify the standard of marking, IF one is to mark, but since it does not require all towers to be marked, the AC cannot serve as the exclusive marking standard.  Thus, the marking requirements can be supplement by state and local law, such as Ordinance 5.5-107.

Thus, the crux of GTP's argument is that absent a federal regulation requiring its tower be outfitted with conspicuity enhancing devices, it has no duty to install them.  Unfortunately for GTP, field preemption only exists only where a particular "field of aviation safety [is] implicated by the lawsuit is governed by pervasive [federal] regulations." *Gilstrap v. United Air Lines, Inc*., 709 F.3d 995, 1006 (9th Cir.2013).  Here, the guy wire marking guidelines of the FAA are merely recommendations.  It is disingenuous and impractical to argue the FAA guy wire marking guidelines are "governed by pervasive federal regulations." *See id*.  Therefore, the field is not preempted and Ordinance 5.5-107 can serve as a supplemental requirement that guy wires of towers located on private property in Jefferson Davis Parish, such as GTP's tower, be marked with tana spherical markers.

Similar Ordinance 5.5-107, local laws regulating the marking of towers exist in Kansas, North Dakota, Idaho, Missouri, California, Montana, Minnesota, Nebraska, Oklahoma, South Dakota, Colorado, Washington, Texas and Wyoming.[3] Many of these regulations require guy wires of MET towers to be marked with high visibility sleeves and spherical marker balls, and despite a diligent search, there is no jurisprudence ruling these local laws are preempted by the FAA or any other federal regulation.  MET towers are usually shorter and encompass a smaller

---

[3] http://www.agaviation.org/statelaws

footprint than GTP's tower, which is 500 feet tall with guy wires extending 300 feet from the base of the tower.  Thus, it only makes sense that marking regulations for MET towers correlate to Ordinance 5.5-107's requirement that all guy wires supporting towers in Jefferson Davis Parish be marked with tana wire markers. Therefore, GTP had a statutory duty to install conspicuity enhancing marker balls on the unmarked guy wires of this tower.

### b. *General principles of law create a duty for GTP to keep the tower in a reasonably safe condition*

Principles of owner and custodian duty of care are deeply rooted in Louisiana jurisprudence.  The owner of a thing or the custodian of immovable property owes a duty to keep the premises reasonably safe "in view of the probability of injury to others." *Bernard*, 645 So.2d at 1158; *Tucker v. Am. States Ins.*, 31,970 (La.App. 2 Cir. 9/22/99, 10), 747 So.2d 620, 626. Thus, the owner/custodian is liable for injury caused by a condition should have been observed in the exercise of reasonable care by the owner/custodian.  *Bernard*, 645 So.2d at 1158; *Tucker*, 747 So.2d at 626.  Actually, GTP's duty is the same under a negligence theory of La. Civ. Code art. 2315 and under as strict liability theory of La. Civ. Code art. 3217.  *Bernard*, 645 So.2d at 1158.  That is to say GTP had a duty to make the tower and the site premises reasonably safe "in the view of probability of injury to others," such as agriculture pilots operating in the adjacent crop field. *See Tucker*, 747 So.2d at 626.

GTP's site lease gives GTP the right to use the premises as its own for its own use. [Document 15-3 & 17-1, p.12].  As previously discussed, GTP has custody/*garde* of the premises.  Thus, GTP cannot argue that it owes no duty to keep the premises, including the tower guy wires, in a reasonably safe condition.  However, GTP will likely argue the scope of that duty does not extend to agriculture pilots, such as Mr. Precht.  Unfortunately for GTP, the scope of the duty, or scope of the risk, is the "legal cause" of the injury, which is a question of fact for the

jury, and thus not appropriate for summary judgment. *Nagle v. Gusman*, 61 F.Supp. 3d. 609, 625 (E.D. La. 2014); *Chatman v. S. Univ. at New Orleans*, 2015-1179 (La.App. 4 Cir. 7/6/16, 11), 197 So.3d 366, 375.

### 2. *Breach*

Breach is the failure to exercise reasonable care under the circumstances. *Naigle*, 61 F.Supp. 3d. at 625. A plaintiff can prove breach by establishing the defendant "knew or should have known of a risk and failed to take reasonable measures to prevent harm." Id. (internal quotations omitted). As previously discussed in the Plaintiffs' analysis of GTP's fault under the strict liability theory of La. Civ. Code art. 2317, GTP was well aware the guy wires were unmarked and it knew or should have known the risk that those inconspicuous unmarked wires posed to pilots. Counsel respectfully directs the Court's attention to Section A of this memorandum for a discussion on GTP's scienter. Moreover, GTP does not dispute, and in fact admits, the tower guy wires anchored in the adjacent crop field were unmarked. Likewise, GTP's "Due Diligence Site Audit" confirms the premises were also defective because the "Site Has No Fence" so as to mark or identify the footprint of the tower. Thus, breach is easily established.

### 3. *Cause-In-Fact*

Cause-in-fact of an injury is a factual question for the jury to decide. *Faye,* 702 So.2d at 1040. It is also discussed in the Plaintiffs' analysis of GTP's fault under the strict liability theory of La. Civ. Code art. 2317. Please see Section A.2. of this memorandum to for a discussion on the unmarked guy wires being the factual of the wire strike that killed Mr. Precht. In sum, Mr. Shattuck testified that the guy wires are essentially invisible to pilots and that in his professional opinion, had the tower been marked with conspicuity enhancing devices, Mr. Precht would have

avoided the wires strike.  [Exhibit A].  Mr. Shattuck expressly testifies that his professional opinion is the unmarked condition of the guy wires was the cause-in-fact of the wire strike and Mr. Precht's consequential death. [Exhibit A].

Moreover, in deciding summary judgments, the Court cannot weigh or consider evidence. *Anderson v. Liberty Lobby, Inc*., 447 U.S. 242, 265 (1986).  Any evidentiary inferences must be made in favor of the non-movant, here the Plaintiffs.  *Id*. Thus, Mr. Shattuck's testimony is sufficient to establish the cause-in-fact of the wire strike that killed Mr. Precht, and it is certainly sufficient to create a genuine issue of material fact, so as to preclude summary judgment.

### 4.  *Legal Cause*

Legal cause is also referred to as "scope of the duty," and is to be decided by the jury. *Naigle*, 61 F.Supp. 3d. at 625. The purpose is to determine whether a particular risk falls with in the scope of the duty. *Id*. (quoting *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289, 293–94 (La.1993)).  The test for legal cause is a case-by-case inquiry of "how easily the risk of injury to the plaintiff can be associate with the duty sought to be enforced." *Todd v. State through Dep't of Soc. Servs., Office of Cmty. Servs.,* 96-3090 (La. 9/9/97, 7), 699 So.2d 35, 39.

Here, the risk of wire strike by agriculture, and general aviation, aircraft is easily associated with GTP's failure to mark the guy wires or to secure the premises by fencing or outlining the footprint of the tower.  As previously discussed, agriculture is a leading industry in Jefferson Davis Parish with over a quarter of a million crop acres in the parish alone.  [Exhibit B].  Moreover, the unmarked guy wires are located 300 feet into the adjacent crop field.  [Exhibit A].  It is readily foreseeable that aircraft would be within vicinity of the tower guy wires because of the known increased agriculture aircraft traffic and the tower's location in proximity to the

Jennings airport. [Exhibit A].  Moreover, GTP's own "Due Diligence Site Audit" confirms it knew the site had no fence and the guy wire anchors were located in the adjacent field.

The legal cause test is akin to the "Likelihood and Magnitude of Harm" prong of the risk-utility balancing test for determining whether the unmarked guy wires presented an unreasonable risk to pilots.  Stated another way, if the risk is easily associated with the injury, the risk is unreasonable.   Counsel respectfully directs the Court to the discussion on regarding the reasonableness of the risk of harm posed by the unmarked guy wires to pilots in Section A.3. of this memorandum.  Simply stated, the evidence strongly supports a finding that the unmarked guy wires and unmarked boundary lines of the tower site were the legal cause of the wire strike.

### 5.  *Plaintiffs' Damages*

Plaintiffs' damages are undisputed.  Mr. Precht died at the age of 52 as a result of the wire strike on February 15, 2013.  He had a loving wife and two children.  He was a business owner and the household's sole income provider.  His wife and children have made claims for loss wages and other general damages, which are recoverable in a negligence action and must be decided by the fact finder. *Williams v. Walgreen Louisiana Co., Inc*., 14-716 (La. App. 5 Cir. 2/25/15, 10), 168 So.3d 812, 822, *writ denied sub nom. Williams v. Walgreens Louisiana Co*., *Inc*., 2015-0610 (La. 6/1/15), 171 So.3d 262, and *writ denied sub nom. Williams v. Walgreens Louisiana Co., Inc*., 2015-0613 (La. 6/1/15), 171 So.3d 262. Thus, the evidence supports a finding of actual damages.

In sum, Plaintiffs' probative evidence produced thus far raises many issues of material fact related to each essential elements of their claims.  Since discovery is ongoing, facts remain to be developed.  However, this Court should view the evidence in a light most favorable to the Plaintiff non-movers and easily find that GTP failed to satisfy its burden of proving no genuine

issues of material fact related to the Plaintiffs' claims exist thereby entitling GTP to a judgment as a matter of law.  Accordingly, GTP's motion for summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny GTP's motion for summary judgment.

> BLOCK LAW FIRM, APLC
> 422 East First Street
> Post Office Box 108
> Thibodaux, Louisiana 70302
> (985) 446-0418 Telephone
> (985) 446-0422 Facsimile
>
> /s/ Kendall J. Krielow
> JERALD P. BLOCK, #3151
> KENDALL J. KRIELOW, #34625

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2017 a copy of the foregoing has been electronically filed by using the CM/ECF system, which will send a copy of the foregoing pleading to all counsel of record by notice of electronic filing.

> /s/ Kendall J. Krielow
> KENDALL J. KRIELOW